UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MARY S.  FEATHERSTON,

        Plaintiff,

v.                                Case No.  3:03cv392/RV/MD

METROPOLITAN LIFE
INSURANCE COMPANY,

        Defendant.

_____/

## ORDER

Pending is Defendant's motion for summary judgment. (Doc. 63).

Plaintiff Mary S. Featherston filed this action pursuant to Title 29, United States Code, Section 1132, of the Employee Retirement Income Security Act of 1974, [29 U.S.C. § § 1001 et seq.], challenging Defendant Metropolitan Life Insurance Company's denial of her claim for long term disability benefits. The defendant now moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Unless otherwise noted, the following facts appear to be undisputed.

### I.    FACTUAL BACKGROUND

#### A.   The Plan

Plaintiff Mary S. Featherston seeks long term disability benefits under Bank of America Corporation's Long Term Disability Plan ("the Plan"), which is an employee welfare benefits plan sponsored by Bank of America and governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  The Plan is funded through a group policy issued by Defendant Metropolitan Life Insurance Company ("MetLife") to Bank of America.[1]  The Plan grants MetLife discretionary authority to interpret the

---

[1] This policy was originally issued to NationsBank, which was the plaintiff's employer at the time she ceased working in 1994.  However, in 1998, while the plaintiff was collecting long term disability benefits under the Plan, NationsBank

terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms.

The Plan provides that MetLife will pay disability benefits when it receives proof that a claimant is disabled.  In turn, "disabled" is defined as follows:

> "Disability" or "Disabled" means that, due to an Injury or Sickness, you require the Appropriate Care and Treatment of a Doctor (unless, in the opinion of a Doctor, future or continued treatment would be of no benefit) and:
> 1. you are unable to perform each of the material duties of your own occupation; and
> 2. after the first 24 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings; or
> 3. you, while unable to perform all of the material duties of your own occupation on a full-time basis, are:
>    a. performing at least one of the material duties of your own occupation or any other gainful work or service on a part-time or full-time basis; and
>    b. earning currently at least 40% [20% in NationsBank Cert.] less per month than your Indexed Basic Monthly Earnings due to that same Injury or Sickness.

The Plan also provides that MetLife will continue to pay LTD benefits as long as the claimant remains disabled and the claimant submits proof of her continued disability when MetLife requests such proof.[2]  Notwithstanding proof of disability,

---

merged with Bank of America, and Bank of America became the surviving corporation. As a result, Bank of America assumed the Long Term Disability Plan initially issued to NationsBank, under which the plaintiff was covered.  Bank of America has made minor revisions to the terms of the Plan, but the terms are in all relevant respects identical to those contained in the NationsBank Plan, and any variances will be noted in this Order.

[2] See Plan, p.5

however, the Plan limits the duration that disability benefits will be paid for any disability due to a mental illness:

> "While you are Disabled due to a Mental Illness, Alcohol or Drug Abuse and not confined in a hospital or institution, the Monthly Benefit will be payable up to the lesser of:
> 1.    24 months; or
> 2.    the Maximum Benefit Duration shown in the Schedule of Benefits.
>
> But in no event will the Monthly Benefit be payable for longer than the Maximum Benefit Duration during a period of continuous Disability due to a Mental Illness, Alcohol or Drug Abuse, whether you are or are not confined in a hospital or institution."[3]

Mental Illness is defined as a mental, emotional or nervous condition of any kind.

B.    The Claim

In 1994, Featherston, who holds a Master's degree in Business Education, worked as an Executive Assistant to a Senior Vice President for Nationsbank in Dallas, Texas.  At that time Featherston was 48 years old and had worked for NationsBank for over ten years.  However, on July 13, 1994, Featherston fell from a ladder over ten feet tall while she was attempting to hang a plant on her balcony at home.  As a result, she suffered severe injuries for which she was hospitalized.  Her injuries included a fracture to her right tibia and fibula[4] and a fracture to her right calcaneus[5] with multiple forefoot fractures on her left side; all of which required surgery.

After the fall, Featherston did not return to work for NationsBank.  Instead, Featherston collected short-term disability benefits until December 14, 1994, at which time she applied for LTD benefits.  Her LTD benefit application was accompanied by

---

[3] See Plan, p.6

[4]  The tibia is the inner bone of the leg, located between the knee and ankle -- generally called the shinbone.  The fibula is the outer bone of the hind or lower limb, located below the knee -- generally called the calf bone

[5] The calcaneus is the heel bone.

an Attending Physician's Statement of Functional Capacity completed by Dr. John Early, Featherston's orthopaedic surgeon.  Dr. Early reported that Featherston was totally disabled from any occupation at that time due to her recent surgery, as well as potentially pending surgeries.[6]  However, Dr. Early also opined that Featherston might be able to resume a sedentary job in six months.  Based on this information, MetLife determined that Featherston was eligible for LTD benefits and notified her that she was approved for benefits effective January 9, 1995.  In her notification letter, MetLife informed Featherston that, "to continue to qualify for Long Term Disability (LTD) benefits, you must meet the definition of Total Disability, as well as satisfy other policy requirements outlined in the Certificate of Insurance."[7]

In 1995, Featherston applied for social security benefits, but her claim was denied.  The Department of Health and Human Services (DHHS) explained that based on Featherston's medical records, it did not appear that her injuries were expected to remain severe enough for 12 months in a row to keep her from working.  DHHS acknowledged that Featherston's injuries were currently severe, but noted that it appeared she would not be permanently disabled.[8]

Throughout 1995, MetLife requested information from Featherston regarding her continued disability.  In a Supplemental Statement of Claim received by MetLife on June 26, 1995, Featherston explained that she usually kept her feet elevated, and only did a minimum of household duties, including feeding her pets.[9]  Featherston also

---

[6] Rec. 67

[7] Rec. 97

[8] Rec. 131

[9] Rec. 104

indicated that she owned an Egyptian Arabian Filly as part of her own business.[10]   On a functional capacity statement completed by Dr. Early on June 1, 1995, and attached to Featherston's supplemental statement, Dr. Early remarked that Featherston had a "moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity," and while she was disabled from her own occupation, she was not totally disabled from *any* occupation.  By way of explanation, Dr. Early noted that Featherston had significant chronic deformity of the right ankle for which he did not expect a fundamental or marked change, but that she should be able to work at least on a part-time basis beginning July 21, 1995.   Similarly, in December of 1995, Dr. Early noted in another functional capacity statement, under a section titled "Mental/Nervous Impairment," that Featherston had Chronic Fatigue Syndrome ("CFS"), Fibromyalgia, and severe depression.  However, Dr. Early again opined that Featherston was not totally disabled from a sedentary occupation.

Based on Dr. Early's reports indicating that Featherston could work on a part-time basis, MetLife called Featherston on February 21, 1996, inquiring whether she would be interested in rehabilitation services to facilitate her return to work. Featherston declined rehabilitative services, advising  the claims representative that she was totally disabled due to the combination of CFS, fibromyalgia, osteoporosis, and her foot injuries.  Nevertheless, she also informed the MetLife representative that she had just returned from a vacation to look at horses and that she continues to own a horse.  Further, Featherston informed the MetLife representative that she lived in a 3 ½ story home, and that her bedroom was located on the top floor.

On November 20, 1996, MetLife informed Featherston via a letter that MetLife was reviewing her LTD claim to determine if she remained eligible for continued

---

[10] Rec. 103

benefits beyond the first 24 months.[11]  MetLife explained that since she had received disability benefits for 24 months, to continue her eligibility, she now had to provide proof that she was physically disabled from *any* occupation for which she was qualified by training, education, and experience.

In order to review her continued disability, MetLife requested Featherston's medical records from her treating physicians.  As a result, Metlife received medical records from Dr. John Willis with the Arthritis Centers of Texas.  Featherston began seeing Dr. Willis in 1993, before her fall and subsequent disability leave.   According to Dr. Willis' medical records, in 1993 Featherston reported pain in the base of each thumb, which Dr. Willis diagnosed as a degenerative type of arthritis.  With regard to the arthritis, Dr. Willis explained to Featherston that "generally people do relatively well without any serious long term complications."  He also diagnosed Featherston with fibromyalgia, and he recommended exercise and noted the possibility of medicinal remedies.  Featherston returned to Dr. Willis again in 1995, after her fall, complaining that her lower back hurt, and complaining that she had trouble opening doors and knobs.  Dr. Willis continued his diagnoses of fibromyalgia and degenerative arthritis, and noted that Featherston frequently had complained of tension headaches and migraines.   However, Dr. Willis' notes also suggested that Featherston continued to remain somewhat active in her life after her 1994 fall.  For example, in his September 10, 1996, office notes, Dr. Willis reported that Featherston had indicated that a week prior she had mowed her lawn.[12]  On November 15, 1996, Dr. Willis indicated that Featherston had missed her appointment because she had just flown back from Amarillo, Texas, where both of her parents were in the hospital.[13]  In fact, on February

---

[11] Rec. 219

[12] Rec. 258

[13] Rec. 255

2, 1997, Featherston informed MetLife that she would be moving back home to Tulia, Texas, in order to take care of both her elderly father and mother, who were ill.

On February 3, 1997, MetLife referred Featherston's file for an independent medical review.  The independent medical examiner, Dr. Robert D. Petrie, M.D., Diplomat, American Board of Preventative Medicine and Occupational Medicine, determined that Featherston had been appropriately diagnosed with fibromyalgia, degenerative arthropathy of the thumbs, adhesive capsulitis of the shoulder, depression, tension headaches, status post right tibial fracture and right calcaneal fracture, status post sacra fracture, and status post foot surgery in June of 1996. Nevertheless, Dr. Petrie determined that Featherston maintained a limited ability to work, allowing her to perform "light work." [14]  Based on the medical records, Dr. Petrie recommended that Featherston be limited to two to three hours standing and walking each day during an eight-hour work shift, which could be interspersed with sitting. Dr. Petrie emphasized that most fibromyalgia patients are capable of work, often with job modifications, and based on Featherston's medical records she did not have an extreme case of fibromyalgia which  precluded her from performing any occupation. Dr. Petrie also noted that the medical records indicated that Featherston had a history of depression with three hospitalizations for depression in the past 20 years.

After receiving Dr. Petrie's review, MetLife forwarded Featherston's file along with Dr. Petrie's report to an outside vendor, Vocational Resources Ltd., for a vocational assessment to determine which, if any, alternative jobs Featherston might be suited to perform.  Linda Gels, a director of Vocational Resources Ltd., reviewed Featherston's personal information, including her experience as a teacher and an executive assistant, her master's degree in Business Education, her residual functional capacities (based on Dr. Petrie's report), and her transferable office management and

_____

[14] Rec. 298-300

clerical skills.    Based on all of this information, Gels identified a number of occupations which would utilize Featherston's previous work experience, but which would also appropriately accommodate her physical limitations and associated need to perform only sedentary work.[15]

After reviewing Featherston's medical records, Dr. Petrie's independent physician's consultant report, and the vocational assessment, MetLife determined that Featherston's LTD benefits should be terminated effective June 5, 1997.   Metlife notified Featherston of its decision via a letter, explaining that she no longer met the definition of "totally disabled" because she could perform at least a sedentary occupation.[16]   As a result, Featherston appealed MetLife's decision, and submitted some additional medical information, including a favorable notice of decision from the Social Security Administration, which finally granted her third application for social security benefits.  Additionally, Dr. James T. Boyd, Featherston's gynecologist, sent MetLife a letter explaining that in his opinion Featherston was totally disabled from any occupation.  Dr. Boyd opined that Featherston was unable to hold any job "at this time" because of her physical condition as well as "the emotional stress that she is, and has been under."  Dr. Boyd pointed out that Featherston's father had just died, and her elderly mother was recuperating from a major illness.  Dr. Boyd continued that Featherston had "experienced an exacerbation of her depression and continues to have major orthopaedic problems."[17]

---

[15] For example, the vocational assessment listed the following job titles as suitable occupations for Featherston: Office manager, employee training supervisor, employment interviewer, and customer service representative.

[16] Rec. 345-348.

[17] Dr. Boyd's office had called MetLife before sending this letter.  Dr. Boyd's staff member informed MetLife that Dr. Boyd was treating Featherston for her mental/nervous disorders, but Featherston had been calling their office, wondering why Dr. Boyd had not submitted medical records to MetLife.  According to Dr. Boyd's

MetLife forwarded Dr. Boyd's letter and Featherston's medical records from Dr. Boyd's office to Dr. Petrie who had previously reviewed Featherston's file.  Dr. Petrie concluded that the new records did not change his previous opinion that Featherston could perform sedentary work.  Dr. Petrie explained that the records provided by Dr. Boyd's office did not show that Featherston was incapable of performing sedentary to light job activities within the parameters outlined in his earlier evaluation.[18]

However, on November 5, 1997, Dr. Early, Featherston's orthopaedic surgeon, wrote a letter explaining that Featherston's injuries did not preclude sedentary type of work, but that she was scheduled for additional surgery in December of 1997 in order to attempt a subtalar fusion to try to relieve Featherston's discomfort from the original accident. Based on Dr. Early's letter, MetLife decided to reinstate Featherston's LTD benefits retroactively, effective from the date of termination on June 5, 1997. However, MetLife also noted that it would reevaluate Featherston's claim at a later date in order to determine whether she remained disabled following her surgery.

After the reinstatement of Featherston's benefits,  MetLife continued to require Featherston to update her disability status.  In June of 1998, Featherston explained on an Activities of Daily Living questionnaire that her activities included reading, feeding her cat and two dogs, caring for her household plants, driving to the post office and supermarket, and caring for her mother who was 87 years-old.

Dr. Boyd also completed a functional capacity statement in 1998, indicating that Featherston was totally disabled from any occupation.   Around July of 1998, Featherston submitted a functional capacity statement from Dr. Howard Weiner, a

---

staff member, the records were not sent because Dr. Boyd knew that her mental/nervous condition was no longer covered under the Plan.  However, after this phone call Dr. Boyd sent this letter, explaining that although he was Featherston's gynecologist, he specializes "in the health problems of people in the menopausal age group."

[18] Rec. 423-25.

gastroenterologist, and Dr. Roger Skiles, an ear, nose, and throat physician, both of which indicated that Featherston was not totally disabled from a sedentary occupation.[19]   In November of 1998, after Featherston's father died, Featherston moved to Mississippi for unknown reasons, but she still took care of her elderly mother who was ill.

In July of 1999, Featherston submitted an APS completed by Dr. Early which indicated that Featherston was totally disabled from any occupation due to the deformity of her foot.   Almost a year later, in May of 2000, Featherston submitted an APS completed by Dr. Patricia Ainsworth, a psychiatrist who treated Featherston on a bi-monthly basis.  Dr. Ainsworth stated that Featherston was totally disabled from any occupation due primarily to major depression, and secondarily to generalized anxiety and headaches.  Moreover, Dr. Ainsworth suggested that Featherston's mental impairment might be a result of a head injury she suffered during her 1994 fall.  In the six years following Featherston's fall from a ladder, this was the first medical record that referred to any potential head injury Featherston might have suffered from the fall. Dr. Ainsworth explains that in addition to a history of depression, a "fall in 1984 (sic) caused severe orthopedic injuries and probably closed head trauma."  Despite this statement, Dr. Ainsworth placed no physical limitations on Featherston pertaining to sitting and grasping, and only some limitation on standing and transportation. However, Dr. Ainsworth indicated that Featherston was unable to work due to psychological factors.  In approximately July of 2001, Dr. Ainsworth noted that Featherston was under "business stress," and indicated that Featherston had shown some moderate improvement psychologically, but her attempts to "maintain family & business duties" became increasingly impaired as her stress increased.[20]   Again, in

---

[19] Rec. 504 and 511.

[20] Rec. 552.

May of 2002, Dr. Ainsworth indicated that Featherston was unable to work due to major depressive disorder.

In April of 2002, MetLife determined that Featherston's file warranted a full review, noting that the most recent medical update, which was dated July 3, 2001, only indicated that Featherston suffered from a mental disability, but did not establish that Featherston maintained physical limitations which prevented her from working. The initial MetLife reviewer also noted that Featherston's file had been somewhat stagnant for awhile.  For example, the reviewer indicated that Featherston had not been personally contacted by a MetLife representative in almost two and a half years.[21]   Therefore, MetLife decided to obtain current progress records from Featherston's treating providers concerning her physical restrictions and limitations. On August 20, 2002, MetLife notified Featherston that her claim was being reviewed to determine her continued eligibility for LTD benefits, and asked Featherston to list her current physicians and complete an Activities of Daily Living questionnaire.

In response, Featherston completed the questionnaire, explaining that she was severely depressed, that she suffered from rheumatoid arthritis, osteoporosis, and insomnia.  She also indicated that her mother's recent death would limit her ability to return to work.  Featherston stated that her daily activities included gardening, taking care of her plants, feeding her dogs, and doing household chores, including some lawn care.  She also noted that she had occasionally helped out with the Animal Rescue League, and she worked on her computer.   Although she indicated that she did not like to leave the house, she did indicate that she still drove.  She also pointed out that she was responsible for taking care of her mentally ill daughter and that until recently she had taken care of her elderly mother, as well.  When asked what accommodations, if any, might be made that would facilitate her return to work, Featherston stated that

---

[21] See Rec. 574, dated April 30, 2002.

she would not be able to return to work at all because of stress, and that if she tried to return she would "be insane."

In addition, Featherston submitted her medical records from her primary care physician, Dr. Whitney Raju, an internal medicine physician.  Featherston began treating with Dr. Raju in 2001.  Dr. Raju's notes dated October 4, 2001, indicate that Featherston had been at her office for evaluation of her severe depression for which she had a long history, including two psychiatric unit hospitalizations and three attempted suicides.  She also suffered from panic attacks when she became extremely stressed.  Additionally, Dr. Raju noted that Featherston's past medical history included a fall in which she hit her head and damaged three different areas of her brain.[22]

Dr. Raju's notes dated December 11, 2001, indicated that Featherston had mixed connective tissue disease, severe depression, hypothyroidism, rheumatoid arthritis, and other medical problems.   Dr. Raju noted that Featherston had been having increased pain throughout her body, which had been exasperated by stress due to her financial situation.  Dr. Raju also remarked that Featherston had a scar on her left ankle which resulted from an injury she had recently received while she was in a horse stall.  At that time, Dr. Raju prescribed medicine for Featherston's condition, remarking that Featherston's case was "very complicated" because of "the number of contributing factors to the patient's depression and stress."  Similarly, on January 15, 2002, Dr. Raju noted that Featherston needed to exercise, but that Featherston's case was complicated because of Featherston's financial problems and the emotional stress of her family situation, specifically that her mother and daughter did not get along.[23]

On August 5, 2002, Dr. Raju noted that she had not seen Featherston in

---

[22] Rec. 632-33.

[23] Rec. 662.

approximately eight months, and since that time Featherston had moved into a rental property and had given away a number of her horses.  Additionally, Featherston had informed Dr. Raju that she needed to be "kept on her feet" in order to take care of her mentally ill daughter.  However, Dr. Raju remarked that Featherston had looked very fatigued and was chronically ill appearing.[24]

Dr. Raju also completed a statement of functional capacity in January of 2002, which reiterated that Featherston had mixed connective tissue disorder, fibromyalgia, asthma and severe depression, but Dr. Raju noted that she could not determine whether Featherston was totally disabled from any occupation.  Moreover, Dr. Raju indicated that Featherston had no limitation on her ability to sit or change positions, and only some limitation with respect to standing, reaching, pushing, and grasping. Dr. Raju noted, however, that Featherston suffered from severe depression which might interfere with her ability to work.

In response to MetLife's request, Dr. Raju completed a Physical Capacities Evaluation ("PCE") on October 3, 2002.  Dr. Raju indicated that Featherston could sit for approximately four hours of an 8-hour work day, stand for 2 hours, and walk for 2 hours.  She noted that Featherston could lift up to 10 pounds frequently, but could not lift over 21 pounds.   Additionally, Featherston could perform simple grasping, but not pushing, pulling or fine manipulations.

On October 31, 2002, MetLife forwarded Featherston's entire file, including the updated medical records, to a MetLife nurse consultant for review.  She concluded that the claims file did not contain any current documentation supporting Featherston's claim that she could not perform at least a sedentary job.[25]  MetLife also requested an updated  vocational  transferable  skills  analysis  be  performed  by  a  vocational

---

[24] Rec. 660.

[25]   Rec. 844

rehabilitation counselor.  The vocational rehabilitation counselor concluded that there were four available sedentary occupations consistent with Featherston's physical limitations, training, education, and experience.

Based on this information, on November 11, 2002, MetLife determined that Featherston was no longer eligible for disability benefits and terminated her benefits effective November 30, 2002.  The MetLife case manager concluded that Featherston:

> . . . has several [diagnoses], but none, either alone or in combination, preclude [Featherston] from sedentary work at this time.  [Featherston's] depression and stress induced panic attacks are not a consideration at this time.  The plan included 24 mo. [mental/nervous]limitation.

In a letter informing Featherston of its decision,  MetLife explained that it had reviewed the most recent information submitted in support of her claim, including the office notes from Dr. Raju and the PCE completed by Dr. Raju on October 3, 2002, and it had determined that these medical records did not support Featherston's claim that she was totally disabled from any occupation.  MetLife determined that most of Featherston's illnesses had been diagnosed prior to her fall in1994, and that there was no evidence to support her assertion that she sustained a head trauma as a result of her fall.    MetLife  concluded  that  the  most  prominent  diagnosis  throughout Featherston's medical file was her history of psychiatric problems, including severe depression and panic attacks.   Since the Plan contained a two-year limitation on coverage for disabilities due to a mental or nervous condition, MetLife determined that Featherston was no longer eligible for benefits under the terms of the Plan.  According to MetLife, the documentation did not establish that Featherston was *physically* unable to perform at least a sedentary job.[26]

After MetLife terminated Featherston's disability benefits, the MetLife nurse

---

[26] Rec. 728

consultant received a call from Dr. Raju regarding the claim.  Dr. Raju informed the nurse consultant that she had received a call from a panicked Featherston who was very upset that her disability benefits were terminated, and who was upset about the PCE which Dr. Raju had submitted on Featherston's behalf.  The nurse consultant asked Dr. Raju if Featherston could work an 8-hour day if she had a normal sedentary job, and Dr. Raju responded that Featherston would have a problem because of decreased focus and concentration.  When the nurse consultant explained the twenty-four month mental/nervous condition limitation, according to the nurse consultant, Dr. Raju agreed that Featherston's problems were primarily psychological.

On December 1, 2002, Featherston appealed MetLife's decision and submitted additional medical records in support of her appeal.  Featherston submitted medical records from the Mississippi Sports Medicine and Orthopaedic Center where she was treated for shoulder and back pain.  Notes from the center dated December 8, 2000, indicated that Featherston had treated for ankle pain which resulted from an accident which had recently occurred in a horse stall.  The horse became frightened and hit Featherston's hip causing her body to spin around.   However, Featherston did not return to the Mississippi Sports Medicine and Orthopaedic Center for treatment until November 22, 2002, more than two years after her last visit.  In 2002, she complained of shoulder pain, but the medical records did not indicate any objective findings regarding the cause of her shoulder pain.

In support of her appeal, Featherston also advised MetLife that she was disoriented much of the time due to the "damage that occurred to my brain when I fell."[27]  In support of this claim, she submitted medical records from Dr. Katherine C. Normal, a psychologist who performed a neuropsychological consultation on Featherston in November of 1999.  During the consultation, Featherston complained

---

[27] Rec. 773

that she was losing her computer skills as evidenced by the fact that it took her a long time to compose a business letter related to her horse business.  Nevertheless, Dr. Normal performed an eight-hour formal assessment of Featherston's general cognitive ability.  Dr. Normal concluded that Featherston's cognitive skills were diminished and generally fell within the lower percentile rank compared with other people who were Featherston's age and within the average classification of intellectual functioning. Additionally, many of Featherston's intellectual skills, such as her motor/psychomotor functions, problem solving skills, and abstract reasoning, were found to be mildly impaired.  Dr. Normal noted that Featherston appeared to have no problem sitting in her office to take the test for over seven hours, despite the fact that they had taken very few breaks.  Dr. Normal also indicated that Featherston's "response style may indicate a tendency to magnify illness, and an inclination to complain . . ."  Further, Dr. Normal opined that Featherston "appears preoccupied with psychological issues, both personal and social, and is likely to overact to difficulties and complain excessively."[28]

MetLife submitted Featherston's medical records along with her appeal letter to Dr. Warren Silverman, who specializes in Occupational Medicine and Internal Medicine, for a physician's consultant review.[29]  Dr. Silverman determined that based on the medical records Featherston would not be able to perform repetitive activities involving the use of her feet, bending, squatting, or elevation of the shoulders above shoulder height, so Featherston would need to work in an occupation which could accommodate these limitations.  Despite these limitations, however, Dr. Silverman concluded that Featherston would be able to physically perform a sedentary or "light duty" occupation although her psychiatric problems might prevent her from reentering

---

[28] Rec. 765

[29] Rec. 777 - 780

the workforce.  Dr. Silverman based his opinion that Featherston did not have a physical limitation or impairment preventing her from performing any gainful work, in part, on the multiple indications in Featherston's medical records that she remained fairly active after her 1994 fall.[30]  Dr. Silverman also based his determination that Featherston was not totally disabled on the "lack of any objective findings suggesting that she would be incapable of working within a sedentary to light duty range."

On January 22, 2003, MetLife called Dr. Raju to ascertain whether she would be submitting any additional evidence, and Dr. Raju stated that she was unsure at that time.  According to the MetLife representative, Dr. Raju stated that she had been going  "around and around" with Featherston who was very upset about the PCE Dr. Raju had submitted.   Dr. Raju stated that she completed the PCE to the best of her ability, but Featherston felt it was unfair because Dr. Raju had not personally witnessed Featherston perform any of the tasks listed on the PCE.  Although Dr. Raju indicated that she had "fired" Featherston from her care, she asked the MetLife representative whether it would make a difference if she submitted an updated PCE, and the MetLife representative told her that it would be worth submitting.

On January 30, 2003, MetLife notified Featherston that it was upholding its initial determination that she was no longer totally disabled under the terms of the Plan and that her disability benefits should be terminated.  Regarding the additional medical records which Featherston had sent to MetLife in support of her appeal, MetLife

---

[30] Apparently Dr. Silverman also went beyond the medical records and decided to do his own research.  In this respect, Dr. Silverman noted,

"under the national point system for the website www.equestrian.org for the year 2001, Susan Featherston is listed with a horse called Tammenshahs Sebek as having received 29 points. This was in the Arabian Hunter Pleasure Open Class.  She is also listed as ranking 17th in the Arabian Halter Class. It is possible that she was in fact the rider, although that is not exactly clear on the site."

explained that it did not consider the medical records pertaining to her psychological state, *i.e.* Dr. Nordal's records, because the Plan did not cover disabilities incurred as a result of mental illness, and there was no evidence in the record to support Featherston's contention that her mental impairment was the result of any alleged head injury suffered during her fall in 1994.  With respect to the records from the Mississippi Sports Medicine & Orthopaedic Center, MetLife determined that the records did not support a finding that Featherston was totally disabled from any occupation.  MetLife informed Featherston that she had exhausted her administrative remedies under the plan, and no further appeal would be considered.

Nevertheless, after receiving notice that her appeal had been denied, Featherston submitted a revised PCE and a revised statement of functional capacity from Dr. Raju based on a January 28, 2003, exam.  Dr. Raju wrote a handwritten note on the top of the updated PCE, stating, "Please note that the [patient] was reevaluated on1/28/03 and the following changes are documented below.  I certify that the evaluation was done by me and that the changes are accurate."  On the revised form, Dr. Raju indicated that during an 8-hour workday, Featherston could only sit for 2 hours, stand for 1 hour, and walk for 1 hour.  Dr. Raju also noted that Featherston could never lift or carry 20 pounds, but she could use her hands for repetitive actions such as simple grasping, and she could occasionally bend.   However, when asked whether Featherston was "totally disabled" from any occupation, Dr. Raju still indicated that she still could not determine that.

Metlife forwarded the updated PCE to its nurse consultant.  The nurse consultant noted that there were no additional office notes from Dr. Raju's office explaining what further testing, if any, had occurred.  Thus, the nurse consultant was not able to determine the reason for Dr. Raju's revisions to the PCE and the statement of functional capacity.  Accordingly, the nurse consultant recommended that MetLife uphold its previous decision.  Featherston was advised that the revised PCE did not

alter MetLife's original determination and that she had exhausted her administrative remedies under the terms of the Plan.

In March 2003, Featherston moved to Crystal Springs, Mississippi, and by September 2003, she moved to Pensacola, Florida.  Featherston then filed this action challenging MetLife's termination of her LTD benefits.


## II.   DISCUSSION

### A.   Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986).  See also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986).  It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  Id. See also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact.  See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).


      B.    ERISA Standard of Review

Under Title 29, United States Code, Section 1132(a)(1)(B), a participant or beneficiary of an employee benefit plan may initiate civil proceedings to recover benefits due under the terms of the plan. In an ERISA benefit case, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, and it reviews the plan administrator's determination in light of the record compiled before the plan fiduciary. Leahy v. Raytheon, 315 F.3d 11 (1st Cir. 2002); Perry v. Simplicity Eng'g, 900 F.2d 963 (6th Cir. 1990). ERISA claims are not triable before a jury. Blake v. Unionmutual Stock Life Ins. Co. Of America, 906 F.2d 1525 (11th Cir. 1990). A judge in a nonjury case is entitled to draw inferences and conclusions from undisputed evidentiary facts. Coats & Clark v. Gay, 755 F.2d 1506 (11th Cir. 1985); Nunez v. Superior Oil, 572 F.2d 1119 (5th Cir. 1978).

ERISA does not provide the standard of review for decisions of a plan administrator. Marecek v. BellSouth Telecomms., Inc., 49 F.3d 702 (11th Cir. 1995). However, in Firestone Tire & Rubber Co. v.  Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1999), the Supreme Court of the United States held that a court must review a denial of benefits de novo, unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id.  If the plan does grant discretion to the plan administrator, then the standard of review is arbitrary and capricious.  The Supreme

Court left open the question of how to review a plan administrator's decision in cases where there is an apparent conflict of interest due to the administrator's exercise of discretion and responsibility for paying the claims, and the various Circuit Courts have taken different approaches.  Following the Firestone decision, the Eleventh Circuit has developed a three level standard to govern review of ERISA claims: (1) de novo review where the plan does not grant the administrator discretion; (2) arbitrary and capricious review where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious review where there is a conflict of interest. See, e.g., HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982 (11th Cir. 2001).

In reviewing a plan administrator's decision when the plan grants discretion, the first question is whether, from a perspective of de novo review of the administrative record, the administrator's decision was "wrong."     Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1138 (11th Cir 2004).  If the court agrees with the claim administrator's decision, i.e. that the decision was "right," the court's inquiry ends and the administrator's decision is affirmed.  If the decision was wrong, the next step is to determine whether the administrator's decision was nevertheless reasonable in light of the information known to the administrator at the time the decision was made (and thus whether the administrator's determination was "arbitrary and capricious" in light of the discretion afforded to the administrator).  Id.  If no reasonable grounds exist in the record to support the administrator's decision, the decision must be overturned.  Id.  However, if reasonable grounds do exist in the record, but a reasonable basis in the record for granting the claim also exists, the court is to evaluate whether the administrator was operating under a conflict of interest when it made its determination (a fact which is stipulated here).  Id.

Where such a conflict of interest exists, the Eleventh Circuit has merely instructed district courts to "apply heightened arbitrary and capricious review." Id.; Torres, supra, 346 F.3d at 1332.  In Brown v. Blue Cross & Blue Shield, 898 F.2d

1556, 1566 (11th Cir. 1990), the Eleventh Circuit had held that where an insurer/claims administrator operating under a conflict of interest bases its decision on a particular interpretation of the plan language, "heightened" arbitrary and capricious review means that the burden shifts to the insurer to "prove that its interpretation of the plan provisions committed to its discretion was not tainted by self-interest." Id. The Eleventh Circuit further explained that "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interests of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." Id. at 1566-67.

However, Brown addressed the application of heightened arbitrary and capricious review to a plan administrator's interpretation of the *plan language*, as opposed to the plan administrator's interpretation of the facts in the record.  In Torres v. Pittson Company, supra, 346 F.3d 1324, the Eleventh Circuit expanded the Brown holding and held that Brown's heightened arbitrary and capricious standard of review should be applied to both plan interpretations and factual determinations of ERISA claims administrators.  Nevertheless, the Eleventh Circuit did not specifically address what evidence may indicate that the administrator's factual determination, as opposed to its plan interpretation, was not motivated by self-interest.  In a plan interpretation case, the burden shifts to the defendant to remove the taint of self-interest by proving that its plan interpretation has the effect of benefitting the class of participants and beneficiaries.  Plan interpretation is much like a legal determination, which is relatively easy to review administratively or judicially.

On the other hand, rote application of the two-pronged burden shifting Brown analysis in the context of factual determinations is less intellectually useful.  As applied, this shifting burden places a greater evidentiary load upon the administrator than does de novo review, while factual findings must necessarily be entitled to a

deferential review.  How can this be done?   I conclude that, where "heightened" arbitrary and capricious review of a conflicted administrator's factual determination is required, Brown's two step inquiry must seek to more realistically evaluate the fairness of the factual determination.   The fundamental burden shifting framework employed by the Brown court can be applied.   An administrator's decision to deny benefits that was supported by reasonable grounds in the record, but which also rejects credible evidence of disability submitted by the claimant, has the practical effect of advancing the administrator's self-interest, and the burden shifts to the administrator "to prove that its decision was not tainted by self interest."   Brown, supra, 898 F.2d at 1566-67.   The administrator can carry this burden by demonstrating the thoroughness and evenhandedness with which the claims review process was conducted.   Evidence of procedural anomalies, reversing an initial grant of benefits without receiving additional evidence, self-serving selectivity in the use of evidence, or an apparent bias in decision-making to the benefit of the insurer are all relevant factors in assessing whether the decision-making process was tainted by self-interest.   See, e.g., Pinto v. Reliance Std. Life Ins. Co., 214 F.3d 377, 393 (3d Cir. 2000)(in applying heightened arbitrary and capricious review to conflicted administrator's factual determinations "we look not only at the result – whether it is supported by reason – but at the process by which the result was achieved.");  Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d 392, 406 (D. Del. 2001).   Whether the decision was supported by an independent medical evaluation, where available under the terms of the plan, may also demonstrate the objectiveness of the claim evaluation.

      C.    Featherston's Claim

      Regardless of which standard is applicable in this case, the first step is to examine the administrative record under a *de novo* standard to determine whether the

administrator's decision was "wrong."[31]    MetLife concluded, after a review of the medical records, an independent physician's consultant review, and a vocational assessment, that  Featherston was capable of performing at least a sedentary job.  I find that this decision is fully supported in the record by competent, substantial evidence.  While it is well established that Featherston suffered orthopaedic injuries from her 1994 fall, the records from her treating physicians were inconsistent as to whether these injuries rendered Featherston totally disabled from any occupation.  In 1999, Dr. Early wrote that Featherston was totally disabled, but that opinion came only after he had previously noted that Featherston should be able to perform at least a sedentary occupation.  Further, Featherston's other physicians indicated that she was not totally disabled from any occupation.  See Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1452 (11th Cir. 1997) (affirming summary judgment for administrator where one of claimant's two treating physicians advised that claimant was "capable of sedentary work.").

     Furthermore, even though the record establishes that Featherston was diagnosed with fibromyalgia, osteoporosis, rheumatoid arthritis, chronic fatigue syndrome, hypothyroidism, and other illnesses,  several of Featherston's physicians indicated that she was still capable of performing at least sedentary work. In fact, Featherston had been diagnosed with most of these illnesses before she stopped

---

     [31] In arguing that MetLife's decision was "wrong," as well as arbitrary and capricious, Featherston repeatedly cites to the depositions of the MetLife representatives for factual support.   However, in determining whether the administrator's decision was wrong under a *de novo* standard of review, I will only consider facts contained in the administrative record.  It is not unless, and until, I determine that MetLife's decision was "wrong" from a *de novo* perspective, based solely on the administrative record, that evidence outside the administrative record may be examined to determine the administrator's self-interest.  See Lee v. Blue Cross, 10 F.3d 1547 (11th Cir. 1994)(holding that even under heightened arbitrary and capricious review, a court may only look to the administrative record to determine whether the administrator's decision was "wrong.")

working in 1994 as a result of her fall.   Additionally, the administrative record belies Featherston's claim that she suffered neurological damage during the 1994 fall.   In September 27, 1996, Dr. Gary Tunell, a neurologist, confirmed that "from a neurological view" Featherston was released to return to full-time work because she was "never neurologically disabled."   Underscoring this conclusion, none of the medical records, including the hospital and ambulance reports completed concurrently with Featherston's 1994 fall, even suggest that she hit her head during the fall, much less suffered neurological damage.   In fact, the first time that a reference to a head trauma suddenly appeared in Featherston's medical records is in the year 2000, six years following the fall, and obviously based on Featherston's own report to Dr. Ainsworth.

Moreover, before the 2002 termination of her benefits, the last report submitted by Featherston which indicated that she was totally disabled due to her orthopaedic problems was Dr. Early's 1999 statement of functional capacity.   This report did not provide MetLife with sufficient evidence of Featherston's current physical limitations as of 2002, when her benefits were terminated.   Featherston argues that since Dr. Early opined in 1999 that Featherston was totally disabled from any occupation, and that he did not expect her condition to improve, this statement of functional capacity is sufficient to establish that Featherston was still disabled in 2002.   Further, relying on Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321 (11th Cir. 2001), Featherston argues that since MetLife initially approved Featherston's claim for disability benefits and continued to pay benefits for eight years, MetLife now carries the burden of proving a change or improvement in Featherston's medical condition before MetLife can discontinue her LTD benefits.

Plaintiff's interpretation of Levinson is not accurate, as other courts have recognized.  See e.g., Fick v. Metropolitan Life Ins. Co., 347 F. Supp. 2d 1271, 1287 (S.D. Fla. 2004)("Levinson does not support the proposition that a plan administrator

should bear the initial burden of proving that the claimant is no longer entitled to benefits under the Policies."); Hufford v. Harris Corp, 322 F. Supp. 2d 1345, 1360 (M.D. Fla. 2004)(holding that Levinson does not shift the burden of proof and "the claimant retains the burden of proving continued disability."); Onofrieti v. Metropolitan Life Ins. Co., 320 F. Supp.2d 1250, 1254 (M.D. Fla. 2004)(holding the Levinson court did not shift the burden "because the defendant had been paying benefits previously, but because the plaintiff had presented evidence that he met the definition of disabled under the plan.")

Indeed, in Levinson, supra, F.3d at 1329, the Eleventh Circuit specifically noted that the claimant continued to provide proof of his total disability.  Based on this continuing proof of disability submitted by the claimant, the Eleventh Circuit emphasized that "all of the evidence before the district court showed that Levinson's condition had not improved and tended to show that he was still disabled under the terms of the plan. . . "  In other words, the district court first acknowledged that the claimant continued to provide sufficient proof that he was still totally disabled, and only then did the court shift the burden to the defendant to provide proof that the claimant's condition had in fact improved despite the claimant's evidence otherwise.

In this case, the Plan specifically states that benefits will be paid "provided you remain Disabled and proof of continued Disability is submitted . . . "[32] (emphasis added).  Featherston did not meet this burden.  But for three years, from 2000 through 2002, Featherston did not submit any medical evidence that would support her claim that she was totally disabled from any occupation due to a physical impairment. Instead, Featherston provided MetLife with records of her mental condition from her psychiatrist, which do not establish that she was unable to work due to a *physical* limitation, and from Dr. Raju, who did not place limitations on Featherston's ability to work a sedentary job and who stated that she could not determine whether

---

[32] Plan, at p. 8.

Featherston was totally disabled.[33]  In fact, the majority of the  medical records submitted by Featherston in the four years preceding the termination of her benefits focused on her psychological problems, as opposed to her physical ailments.

The only medical evidence submitted after 1999 which indicated that Featherston was still physically incapable of performing at least a sedentary job was the supplemental PCE of Dr. Raju dated January 28, 2003, and submitted after MetLife had already terminated Featherston's benefits, based in part on Dr. Raju's earlier and contradictory PCE.   Other courts have cautioned against giving significant weight to a physician's supplemental and changed opinion "when that opinion follows the patient's denial of benefits and is issued without any justification for the change." Raskin v. UNUM Provident Corp., 2005 WL 271939, at 3-4 (6th Cir. Feb. 3, 2005). Furthermore, MetLife is not required to give deference to a treating physician, who is naturally sympathetic to her patient's claim. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825, 123 S. Ct. 1965, 1967, 155 L. Ed. 2d 1034 (2003)(holding that "plan administrators are not obliged to accord special deference to the opinions of treating physicians."); Sweatman v. Commercial Union Ins. Co., 39 F.3d 594, 603 (5th Cir. 1994).

This caution seems especially relevant in a case such as this where the treating physician changed her opinion regarding the patient's disability only after the patient harassed the physician and repeatedly called the physician's office upset about the original opinion.  MetLife's nurse consultant considered Dr. Raju's changed opinion, but upheld the original decision in part because Dr. Raju did not provide any notes or evidence explaining the updated PCE.  Featherston makes much of the fact that

---

[33] Featherston stopped treating with Dr. Early in1999, most likely due to her relocation from Texas to Mississippi.  Nevertheless, Featherston informed MetLife that after her move she had seen an orthopaedic specialist, Dr.Vice, but it appears that Featherston did not provide MetLife with any medical records from Dr. Vice's office.

MetLife did not require accompanying office notes to support earlier PCE's which favored MetLife's decision.  While this may be true, in light of the fact that Dr. Raju's updated PCE was a substantial departure from her previous opinion issued only two months earlier,  in conjunction with evidence that Featherston had repeatedly called Dr. Raju complaining about the earlier PCE and perhaps scaring Dr. Raju, it was not unreasonable for MetLife to view the updated PCE with a suspicious eye and require Dr. Raju to explain the reason for her changed opinion.[34]  There was no evidence of any further testing by Dr. Raju, and the revised opinion must also be considered in conjunction with Dr. Raju's earlier determination that the plaintiff's problems were primarily psychological.

In addition to the medical evidence, there were numerous references in the record which indicated that Featherston remained somewhat active despite her claims of total disability.  For example, in 1996 she admitted to MetLife that she owned only one horse, but Dr. Raju's notes of August 5, 2002, indicate that Featherston had just given away "a number of her horses," lending support to MetLife's claim that Featherston was still actively engaged in the horse business.  In fact, she was in a horse stall as recently as December of 2000, when she had injured her ankle.  Further, it appears that Featherston was physically able to take care of her medically ill elderly mother and her mentally ill daughter; she occasionally helped out with charitable functions; she  gardened; she was still able to drive; and she had moved several times after her fall.

Finally, Featherston's own statements to MetLife suggest that her psychological condition was the primary impediment to her return to a sedentary job.  Featherston repeatedly referred to her severe depression as one of her disabling conditions, and she

---

[34] On February 10, 2003, during a phone conversation, Featherston advised MetLife that Dr. Raju had fired her because "Dr. Raju thought I would hurt her and I don't even own a sharp knife."  Rec. 864.

explained to MetLife that she could not return to work because the stress would make her insane.   Therefore, the record reflects that there is substantial, competent evidence to support MetLife's conclusion that Featherston is no longer totally disabled under the terms of the Plan.  Thus, under either the *de novo* standard of review or the arbitrary and capricious standard, this court's inquiry ends and MetLife's denial of disability benefits is due to be upheld.   Further, even if I were to determine that MetLife's decision was "wrong", the denial of benefits is not arbitrary and capricious if Featherston fails to submit objective evidence of a disability which prevents her from working in a sedentary occupation.  See e.g., Daniels v. Hartford Life & Accident Ins. Co., 898 F. Supp. 909, 912 (N.D. Ga. 1995). See also, Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 380 (7th Cir.1994).

III.    **CONCLUSION**

        For the foregoing reasons, the Defendant's motion for summary judgment (Doc. 63) is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff.  No costs shall be taxed.

        DONE and ORDERED this 20th day of September, 2005.

                                        */s/ Roger Vinson*
                                        **ROGER VINSON**
                                        **Senior U.S. District Judge**